NOTICE

Decision filed 11/17/25. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2025 IL App (5th) 220717-U

NO. 5-22-0717

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 19-CF-111 |
| | ) | |
| IAN G. HAMILTON, | ) | Honorable |
| | ) | Walden E. Morris, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOLLINGER* delivered the judgment of the court.
Justices Boie and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence, where: (1) defendant was not denied his constitutional right to self-representation, (2) defendant forfeited the issue of whether trial counsel was ineffective for stipulating to specific predicate felony convictions, (3) the State did not make improper remarks in its closing argument or rebuttal, and (4) the trial court did not abuse its discretion in disallowing posttrial testimony of jurors.

¶ 2    Following a jury trial in the circuit court of Saline County, defendant, Ian G. Hamilton, was found guilty of armed habitual criminal (720 ILCS 5/24-1.7(a)(1), (2) (West 2018)) and two counts of unlawful possession of a weapon by a felon (*id.* § 24-1.1(e)). Prior to sentencing, one of the counts of possession of a weapon by a felon merged into defendant's conviction for armed

---

*Justice Barberis was originally assigned to the panel. Justice Bollinger was later substituted on the panel and has listened to oral arguments and read the briefs.

1

habitual criminal and defendant was subsequently sentenced to a period of 12 years on the armed habitual criminal count, an 85% sentence, concurrent to 7 years on the remaining count of possession of a weapon by a felon.

¶ 3 Defendant raises four issues on appeal. Defendant asserts (1) that he was denied his constitutional right to self-representation when the trial court denied his request to proceed *pro se*; (2) that he received ineffective assistance of counsel when trial counsel stipulated to the names of the predicate offenses under the armed habitual criminal statute; (3) the State made improper arguments during closing arguments and rebuttal when it argued that the "only" reason for his flight from police was consciousness of guilt, specifically for the firearm he was alleged to possess; and (4) the trial court abused its discretion when, during the hearing of his posttrial motions, it quashed defendant's subpoenas for jurors and disallowed their testimony. For the following reasons, we affirm the conviction.

¶ 4                                   I. BACKGROUND

¶ 5 On March 1, 2019, defendant, Ian G. Hamilton, was charged by way of information with six separate offenses based on a police encounter from February 27, 2019: (1) armed habitual criminal (*id.* § 24-1.7(a)(1), (2)), a Class X offense, alleging that he had possessed a Glock 43 9-millimeter handgun after having been previously convicted of the offenses of aggravated robbery and aggravated unlawful use of a weapon; (2) unlawful possession of a weapon by a felon (*id.* § 24-1.1(e)), a Class 2 offense with a special sentencing range, alleging that he had possessed a Glock 43 9-millimeter handgun after having been previously convicted of aggravated robbery, a forcible felony; (3) unlawful possession of a weapon by a felon (*id.*), a Class 2 offense with a special sentencing range, alleging he had possessed 10 9-millimeter rounds of firearm ammunition after having been previously convicted of aggravated robbery, a forcible felony; (4) aggravated

2

fleeing or attempting to elude a police officer (625 ILCS 5/11-204.1(a)(1) (West 2018)), a Class 4 offense, alleging he, the driver of a motor vehicle, had fled from Officer Eric Gott of the Harrisburg Police Department and that he had disobeyed two or more traffic control devices while so doing; (5) unlawful possession of cannabis (720 ILCS 550/4(e) (West 2018)), a Class 3 offense, alleging that he had possessed between 500 and 2,000 grams of a substance containing cannabis; and (6) criminal damage to government supported property (720 ILCS 5/21-1.01(a)(1) (West 2018)), a Class 3 offense, alleging that he had damaged a police vehicle with the damage being between $500 and $10,000. These offenses were originally charged by the Saline County State's Attorney's Office; however on October 22, 2019, the Saline County State's Attorney's Office withdrew in favor of the appointment of a special prosecutor, the sitting State's Attorney of Pope County, due to a conflict. Prior to that date, on March 28, 2019, defendant had requested, and been granted, a bond reduction with the additional condition that he be required to wear a GPS ankle monitor at his own expense. Defendant subsequently posted bond and was released with an ankle monitor.

¶ 6        On December 19, 2019, defendant asked the circuit court to relieve him of the ankle monitor requirement, indicating that it affected his ability to maintain employment and had become a financial burden. The circuit court denied that motion, but stated that it understood the ankle monitor had become a burden, and as a result, set the matter for jury trial on January 27, 2020, with a final pretrial hearing on January 10, 2020, so that the matter, including that of bond conditions, could be resolved quickly. On December 19, 2019, the trial court discussed setting a trial date with counsel and inquired if a motion to sever counts would be filed. Defense counsel indicated he planned to file such a motion and the State stated it had no objection to such a motion, indicating it would proceed to trial on counts I through III. Based on that discussion, the court treated the discussion as an oral motion to sever and granted it. It was determined that the matter

3

would proceed to trial first on counts I through III. On that same hearing date, defendant also indicated that the ankle monitor's financial cost prevented him from hiring private counsel, which he needed to do as his current appointed lawyer had "a lot of cases."

¶ 7 On January 10, 2020, the matter was called for the final pretrial hearing. On that date, counsel for both parties announced they were ready for trial and defendant immediately asserted he needed a new attorney. The trial court replied that defendant could "hire anybody you want." The trial court specifically inquired of defendant's attorney whether he had subpoenaed any witnesses and counsel replied, "Yes. I will get them subpoenaed." However, defendant interjected again, telling the trial court that his attorney had neither spoken to nor subpoenaed any of his witnesses, and that he had not seen the discovery in his attorney's possession. The trial court told defense counsel to speak to his client, and stated, "We're going to trial on the 27th," before adjourning the proceeding.

¶ 8 On that same January 10, 2020, date, defense counsel filed a motion to withdraw as counsel, indicating defendant wished to represent himself. On January 21, 2020, defendant filed an entry of appearance stating he wished to represent himself. On January 27, 2020, the matter was called for a jury trial and the matter of defense counsel withdrawing so defendant could proceed *pro se* was heard. The trial court inquired of defendant about his position, to which he indicated that he and his attorney were having "irreconcilable differences" and that he thought that his attorney "just *** has too many actual cases." Defendant affirmed that he wished to represent himself. The trial court informed defendant that he had the absolute right to represent himself and began to admonish him about the nature of the counts he was about to be tried on and their possible penalties. The trial court verified defendant wanted to represent himself and, having received an affirmative response, informed defendant the case was proceeding to trial on that date. Defendant

4

indicated it was not his understanding that the matter was going to proceed to jury trial on that date, to which the trial court told defendant that it had indicated on both December 19, 2019, and January 10, 2020, that the case would be proceeding to trial on that date. Defendant indicated he did not have any of his witnesses present on that date.

¶ 9 In response, the trial court reaffirmed that defendant still wished to represent himself and inquired about defendant's general proficiency in English and litigation experience. Defendant informed the trial court that he was proceeding *pro se* on a pending Johnson County case at that time. Defendant stated, however, that there were things that he did not understand. The trial court inquired about defendant's lack of understanding and explained that it could not represent him. Defendant stated that he understood and asserted that his attorney was "telling me one thing and then I get to court and it will be another thing." He mentioned motions he had wanted filed, and the trial court inquired of the clerk whether any of the motions defendant was referring to had been filed; the clerk indicated that they had not.

¶ 10 The trial court once again admonished defendant regarding the potential penalties he faced and informed him that the prosecutor was a proficient trial attorney. In response, the following exchange transpired:

"THE DEFENDANT: But you wouldn't give me no other lawyer.

THE COURT: I'm not going to give you another lawyer. I told you, you can hire anybody you want. You are not going to get another lawyer appointed by this Court. You've got the right to go to trial by yourself. We're going to thrash this out. We're going to go to trial today. Okay?

THE DEFENDANT: But there's no way.

5

THE COURT: You are either going to represent yourself if that's your choice, but I'm here to make sure that you know what you are doing, Mr. Hamilton. Now, [defense counsel] is a skilled lawyer."

The trial court continued to inquire of defendant regarding his preference to self-represent or to proceed with legal counsel. Instead of providing a direct response to the court, defendant articulated his belief that he was not receiving a fair trial and that his rights were not being protected. Subsequently, defendant expressed his desire to be represented by defense counsel, leading to the following exchange:

"THE COURT: All right. [Defense counsel], Mr. Hamilton wants you to represent him, and he wants you to do a good job. Is that what you're saying, Mr. Hamilton?

THE DEFENDANT: I will—honestly, I really wish I had a different lawyer. I wish I had another—

THE COURT: You don't have a different lawyer. You've got [defense counsel]."

Defendant continued to articulate his dissatisfaction with defense counsel. The trial court admonished defendant that he must either proceed to trial that day representing himself or be represented by counsel. Defendant responded by complaining that he lacked witnesses for the trial. The following exchange then ensued:

"THE COURT: All right. Are you going to represent yourself, Mr. Hamilton, or you want [defense counsel] to represent you?

THE DEFENDANT: This trial just seems rigged. It just seems rigged.

THE COURT: You can say it's rigged all you want. I'm asking you a question.

THE DEFENDANT: Your Honor, I can prove—

6

THE COURT: Do you want [defense counsel] to represent you or do you want to represent yourself?

THE DEFENDANT: Your Honor, you're not—Your Honor, you're not giving me a fair trial. This is not a fair trial.

THE COURT: Mr. Hamilton, what is your choice here? You've got two choices.

THE DEFENDANT: My attorney just told you he's not ready, so if he does—if I say I do, I honestly want [defense counsel] to represent me but if he says—"

¶ 11 A brief recess followed to allow the State and defense counsel to discuss possible resolutions. Before the trial court took its recess, defendant again expressed concern about having his witnesses present. The trial court indicated to defendant that he should contact one of his potential witnesses, his mother, and tell her that the trial would indeed proceed that day so her presence could be arranged.

¶ 12 Following the recess, the trial court confirmed with the State and defense counsel regarding the state of negotiations, ensured that defendant had been informed of the offer in the case, and confirmed that defendant did not wish to plead guilty. Defendant reaffirmed that he did not wish to plead guilty and informed the trial court that in attempting to contact his mother, he had spoken to his aunt, who indicated that she had retained legal counsel for him. The trial court indicated that if new counsel were to appear the following day, they would be allowed to enter and continue the jury trial on defendant's behalf. Matters continued apace, and the trial court consulted with both counsel regarding several matters, including defendant's stipulation to the predicate felonies for the charge of armed habitual criminal.

¶ 13 Defendant again articulated concerns regarding his witnesses and the preparation undertaken by his attorney concerning those witnesses. The trial court inquired whether there were

any additional matters to address, and defendant reiterated his desire to represent himself. The trial court revisited the issue, with defendant still not directly answering the trial court's inquiries. Rather, defendant complained that defense counsel had told his mother that there was not going to be a trial on that date. The trial court instructed defendant to inform his mother to be present the following day to testify, should he wish to utilize her as a witness, and subsequently recessed the proceedings.

¶ 14    After the recess, matters proceeded to jury selection. During this process, one juror, T.J.,[1] indicated she knew defendant from attending school with him, but that she did not feel this acquaintance would impact her ability to serve as a fair and impartial juror. She also indicated that she had previously heard some information about the case, but likewise indicated she could put this information aside and reach a verdict without regard to it. Initially, defense counsel indicated his intention to use a peremptory challenge on T.J., but defendant expressed a desire to retain her, stating, "I thought I was representing myself anyway." Based on defendant's statements, defense counsel indicated that T.J. should remain and she was ultimately impaneled as a juror.

¶ 15    Based on defendant's indication, during the jury selection conference and outside of the presence of the jurors, that he believed he was representing himself, the trial court once again addressed the matter of defendant proceeding *pro se*. To that end, the following exchange occurred:

> "THE COURT: All right. Mr. Hamilton, you've said everything. You've said you want to represent yourself. You've said you don't want to represent yourself. You said you want [defense counsel].

---

[1]In an effort to maintain both clarity and the privacy of the juror, this court has chosen to refer to the juror by initials rather than name.

THE DEFENDANT: The whole time I said that I would represent myself, but if I could—

THE COURT: All right. You want to represent yourself? You see how this goes. You see the issues here. You know you are not an attorney. You know [the State] is.

THE DEFENDANT: You are not giving me an honest trial. You know you're not. Deep down—like he said, deep down inside you know you're not giving me no fair trial.

THE COURT: Mr. Hamilton, do you want to represent yourself or do [you] want [defense counsel] to represent you? Now, you can talk to [defense counsel]. [Defense counsel] can consider what you say. Obviously, that's his obligation.

THE DEFENDANT: I feel like this case is prejudiced though.

THE COURT: All right. I know what you've said. I know what you've told me.

THE DEFENDANT: You know what you're doing though.

THE COURT: I know that we are going to go to trial today. I have told you and told you.

THE DEFENDANT: You know what you're doing. You know I don't have no—like you got me in a corner. You know that you are not even giving me a fair trial. This is—

THE COURT: Do you want to represent yourself or not?

THE DEFENDANT: This is my life and you sitting up here and you basically just—

THE COURT: Do you want to represent yourself or not?

THE DEFENDANT: I want a lawyer.

THE COURT: You've got a lawyer. [Defense counsel] is your lawyer. And as you've already seen in there, he's a good lawyer.

THE DEFENDANT: We having differences, man.

THE COURT: Do you want to represent yourself or do you want [defense counsel] to represent you?

THE DEFENDANT: Is this legal? Is this like—

THE COURT: I don't know. The Appellate Court will tell you whether it's legal or not. It's legal for today.

* * *

THE COURT: Do you want to represent yourself or do you want [defense counsel] to represent you?

THE DEFENDANT: I want a lawyer.

THE COURT: You've got a lawyer.

THE DEFENDANT: He's not representing me correctly.

THE COURT: All right. [Defense counsel], confer with your client with this jury selection.

THE DEFENDANT: I said I want a lawyer. I didn't want [defense counsel].

THE COURT: [Defense counsel] is your lawyer, and I told you on—

THE DEFENDANT: But you appointed him. You making me—you forcing me to go—

THE COURT: And I told you—Mr. Hamilton, I told you back in December you have the right to hire anybody you wanted. You haven't hired anyone. [Defense counsel] is your lawyer.

THE DEFENDANT: Look how he—

THE COURT: We're going to go to trial today.

10

THE DEFENDANT: You appointed this lawyer to me and then you making him just represent me.

THE COURT: No. Do you want—

THE DEFENDANT: I didn't—

THE COURT: —to represent yourself?

THE DEFENDANT: I done seen people fire lawyers before and get another lawyer.

THE COURT: Do you want to represent yourself?

THE DEFENDANT: I done seen—what happened to Nathan Rowland?

THE COURT: Mr. Hamilton, now you are about ready to push me too far. Do you want to represent yourself?

THE DEFENDANT: Your Honor, I'm trying to be—I'm not trying to be a pest to nobody or burden."

Defendant continued to express grievances about the trial court not allowing him to speak, concerns about his bond, allegations that the trial court was setting him up to fail, disputes with his defense counsel, and defense counsel's failure to subpoena witnesses. At no point did defendant directly respond to the trial court's inquiry regarding his desire to self-represent. Subsequently, the trial court proceeded with the jury selection process.

¶ 16     Throughout *voir dire*, defense counsel inquired of all potential jurors about whether defendant's status as a convicted felon, as was alleged in the charges, would affect their ability to treat defendant fairly and decide the case impartially. Those that indicated they could not were stricken for cause by the trial court. The jurors who were impaneled indicated that they could decide the case on its merits and not prejudge defendant based on his status as a convicted felon.

Defense counsel conferred with defendant throughout the selection process as to whom to strike or retain.

¶ 17    During the jury selection process, defense counsel informed the trial court that defendant had told him he had hired an attorney. The trial court, having determined that evidence would not begin until the following day, advised defendant that he needed to have his new counsel present at that time. Defendant did not have new counsel present at any point during the jury selection process or the trial.

¶ 18    Throughout the jury selection process, defendant expressed dissatisfaction with being required to continue with his current attorney, asserting he had hired another attorney and was not being permitted to represent himself. At the conclusion of jury selection, defense counsel indicated that defendant wished to "reiterate his request to represent himself and to have a little time to prepare for trial." The trial court again addressed the matter, beginning by reiterating that it had previously admonished defendant of the penalties he faced and told defendant he had the right to represent himself. Defendant acknowledged these facts, but equivocated, claiming he lacked access to his discovery. The trial court indicated that defense counsel had the discovery and sought to ascertain whether defendant wished to proceed *pro se* with the benefit of his current counsel as standby counsel. Defendant continued to express concerns about insufficient time to review discovery, and the following exchange occurred:

> "THE COURT: Okay. Mr. Hamilton, I'm going to ask you again. Do you want to represent yourself?
>
> THE DEFENDANT: I have an attorney.
>
> THE COURT: Do you want to represent yourself?
>
> THE DEFENDANT: I have an attorney.

THE COURT: That's not an answer to my question. Do you want to represent yourself in this case?

THE DEFENDANT: You're trying to trick me with my words. I have an attorney is what I'm saying.

THE COURT: You want [defense counsel] present with you, not representing you, but asking or answering any questions that you might have of him?

THE DEFENDANT: I see what you're doing.

THE COURT: What is your pleasure, Mr. Hamilton?

THE DEFENDANT: I told you my pleasure. You're not—you don't want—you're not listening what my pleasure—my pleasure would be to have a fair trial. That's all I'm asking.

THE COURT: Okay. You are going to have the fairest trial I know how to give you, but we're going to go to trial today, and we're going to finish this trial whenever it finishes.

THE DEFENDANT: You're not giving me a fair trial.

* * *

THE COURT: Okay. What do you want to do? Do you want to represent yourself or you don't?

THE DEFENDANT: I mean I want an attorney, but my attorney's not here right now.

THE COURT: Mr. Hamilton—I want the record to reflect Mr. Hamilton will not answer the Court's questions. I've been through this with Mr. Hamilton over and over. At times he tells me he wishes to be represented by an attorney, then he tells me that he doesn't.

13

So, [bailiff], bring the jury in.

THE DEFENDANT: I never said—

THE COURT: [Defense counsel] is your attorney, Mr. Hamilton.

THE DEFENDANT: I never said I wanted Mr.—this is what—I want the record to reflect this because I said I wanted a attorney. I said I did not want [defense counsel] as my attorney.

THE COURT: All right. Bring the jury in, [bailiff]."

¶ 19 Following that exchange, the trial court proceeded with opening admonishments to the jury and both sides presented their opening statements. During its opening statement, the State referenced the severed charges and indicated that after defendant had fled police in a vehicle, a search of the vehicle was conducted. The State indicated that during that search, "they located several items of interest to law enforcement, but most importantly what they located in the front floorboard of the driver's compartment by his feet or where his feet would have been they find a Glock 43 9mm handgun." The State's opening statement also made a single reference to defendant's prior predicate offenses for armed habitual criminal by name, indicating those convictions were why he could not possess a firearm.

¶ 20 Following opening statements, a preliminary discussion about jury instructions was held outside the presence of the jury, during which defendant raised the concern of his specific prior felonies being heard by the jury. In response, the trial court inquired of the State about its burden of proof and whether proof of specific types of felony offenses was required. The State indicated that proof of specific types of felonies was required. The trial court addressed defendant directly, indicating that it would not generally allow proof of specific prior felonies, but because armed habitual criminal did not allow all felonies, but only specified ones as qualifying priors, this was

14

an exception. This discussion prompted discussion of Illinois Pattern Jury Instructions, Criminal, No. 3.13X (approved Oct. 17, 2014), which addresses the limited admissibility and purpose of prior convictions. After this preliminary jury instruction conference, court was recessed for the day.

¶ 21 The following day, defense counsel filed a motion *in limine* seeking to bar the introduction at trial of evidence concerning the 1,362 grams of cannabis that had been found in the vehicle driven by defendant on the offense date, as it was the subject of one of the severed counts. The State initially objected, asserting the cannabis to be integral to the "narrative" of the traffic stop. However, the State ultimately agreed to the motion *in limine* and evidence of the cannabis was excluded.

¶ 22 Prior to the presentation of evidence, the bailiff indicated that one juror, T.J., had expressed some concerns about serving on the jury. The trial court then spoke to T.J. about her concerns in the presence of the State, defense counsel, and defendant. T.J. indicated that she felt she knew defendant too well to serve on the jury, having gone to school with him. The State confirmed she had mentioned her prior knowledge of defendant during *voir dire* the day before. When asked what had changed overnight, she stated, "I just feel like I just don't need to be on it. It's just a feeling that I have." T.J. indicated she felt "uncomfortable" about serving on the jury. Following the questioning of T.J., the trial court indicated that it was not going to remove T.J. unless both parties agreed it was appropriate. Both parties indicated they did not want her removed, and so T.J. remained on the jury.

¶ 23 The State opened its evidence with the admission of a stipulation as to defendant's predicate felony convictions for the charges of armed habitual criminal and unlawful possession

15

of a weapon by a felon. The names of those predicate convictions were included in the stipulation and the stipulation was published to the jury.

¶ 24   The State first called Chief Michael Riden of the Harrisburg Police Department. Chief Riden testified that he was the chief of police as well as the evidence custodian for the department. People's Exhibits 2, 3, and 4, a Glock 43 9-millimeter pistol, 9-millimeter gun magazine, and 11 rounds of 9-millimeter ammunition, respectively, were presented to Chief Riden and identified as items that Officer Gott of the Harrisburg Police Department had submitted to the custody of the Harrisburg Police Department evidence lock-up. Chief Riden testified that he had maintained proper custody of those exhibits as evidence custodian and allowed no unauthorized tampering.

¶ 25   Officer Eric Gott of the Harrisburg Police Department testified next. He testified that on February 27, 2019, at about 10:40 in the evening, he was in his squad car on patrol when he attempted to conduct a traffic stop on a gray Dodge Charger that had failed to stop at a stop sign. Officer Gott testified that, after he had activated his overhead lights, the gray Charger pulled over to the side of the road and stopped. Defendant emerged from the driver's side of the vehicle and approached his squad car. Officer Gott indicated he exited his squad car and ordered defendant back into his vehicle. Defendant returned to the Charger and drove away at a high rate of speed. Officer Gott returned to his squad car, informed dispatch that the vehicle was fleeing, and pursued the Charger.

¶ 26   Officer Gott detailed the exact route of the vehicle pursuit, indicating speeds exceeded 50 miles per hour and that defendant stopped at none of the intersections the chase proceeded through. Ultimately, the Charger turned down an alleyway where it struck the squad truck of Officer Logan Leverett of the Harrisburg Police Department, bringing the Charger to a halt. Officer Gott pulled in behind the Charger, boxing it into the alleyway. Defendant attempted to reverse the Charger,

16

but struck Officer Gott's squad car. Both Officers Gott and Leverett exited their vehicle and approached the Charger. Officer Gott observed defendant to be the sole occupant of the vehicle. Defendant exited the Charger through the front passenger door and fled on foot.

¶ 27 Officer Gott pursued defendant on foot, accompanied by Officer Leverett and Deputy Adam Stanley of the Saline County Sheriff's Office, ultimately apprehending defendant and placing him in handcuffs. Defendant was returned to the alleyway and secured inside Officer Gott's squad car. A search was performed on the Charger, during which Officer Leverett discovered the Glock 43 9-millimeter handgun. The magazine and ammunition were initially contained within the firearm, but were separated by Officer Gott prior to being placed in the care of the evidence lock-up of the Harrisburg Police Department. Officer Gott initially indicated the firearm was found in the front passenger floorboard of the Charger, but later indicated that it was found in the driver's seat area of the vehicle, in plain view. During cross-examination, Officer Gott admitted he was unaware of where the firearm was located in the Charger prior to its collision with both squad vehicles.

¶ 28 Officer Leverett was the State's third witness. Officer Leverett stated that, through radio traffic, he became aware of Officer Gott's pursuit of defendant. He attempted to locate the pursuit to assist, and during this effort he was struck on the passenger side of his squad truck while crossing in front of an alleyway. After striking Officer Leverett's vehicle, the Charger backed up and struck Officer Gott's squad car, which had pulled up behind the Charger, blocking it in. Officer Leverett exited his vehicle and observed defendant in the driver's seat of the vehicle. No other individuals were observed within the vehicle. Defendant was ordered to raise his hands and exit the vehicle; however, he instead fled through the front passenger side of the vehicle and began a foot chase.

17

Defendant was apprehended, handcuffed, and escorted back to the alley, where he was placed in the rear of Officer Gott's squad car.

¶ 29    Officer Leverett testified he and Officer Gott then searched the Charger, where he located the Glock handgun, with the magazine and ammunition inside of it, in plain view on the driver's side floorboard of the vehicle. Upon cross-examination, Officer Leverett also admitted he did not know the position of the firearm within the Charger prior to the crashes.

¶ 30    The State's final witness was Deputy Adam Stanley. He testified that he commenced efforts to assist Officer Gott after hearing radio traffic. He observed the Charger fleeing from Officer Gott's squad car and took steps to assist its apprehension when he came upon the Charger in the alleyway between two squad vehicles. Officers Gott and Leverett were standing outside of the Charger and ordering defendant to exit. Deputy Stanley observed defendant in the driver's seat of the vehicle and viewed the interactions between him and the other officers. Deputy Stanley also ordered defendant out of the vehicle, but defendant exited the passenger side of the Charger and fled on foot. Deputy Stanley joined the pursuit, utilizing his radio to communicate their positions to dispatch. He ultimately apprehended defendant by grabbing him and taking him to the ground. Defendant was handcuffed and returned to Officer Gott's squad car. Deputy Stanley testified he was not involved in the search of the Charger, but did observe a handgun in plain view on the driver's side floor of the vehicle. During cross-examination, Deputy Stanley admitted he was unaware of the firearm's location in the Charger prior to the collision with Officer Leverett's vehicle.

¶ 31    The State rested and defense counsel moved for a directed verdict, which was denied. The trial court admonished defendant about his right to testify and took a short recess. Upon returning, defense counsel called his only witness, defendant's wife Caitlyn Hamilton.

18

¶ 32    Mrs. Hamilton testified that she had married defendant after the February 27, 2019, incident with police but prior to trial. She was dating defendant at the time of the incident. She testified she was the owner of both the gray Dodge Charger driven by defendant when he encountered police as well as the Glock handgun. She testified she had a FOID card and carried the Glock handgun in the vehicle with her when she drove. However, she testified that she removed the handgun and kept it with her when she was not driving the vehicle.

¶ 33    Mrs. Hamilton stated that on February 27, 2019, she had gotten off work in Harrisburg and went to a coworker's house, also in Harrisburg. Defendant was already at her coworker's residence. Prior to her arrival she had been alone in the Charger with the Glock handgun, which was placed underneath the driver's seat. She did not remove the handgun from the Charger when she arrived at her coworker's house, and proceeded inside. She and her coworker began talking, and defendant asked to borrow the Charger so he could go to his mother's house, also located in Harrisburg. Mrs. Hamilton allowed him to borrow the vehicle but neither removed the firearm nor did she inform defendant it was in the vehicle.

¶ 34    During cross-examination, Mrs. Hamilton indicated that she tended not to carry the Glock firearm when she was with defendant because she was aware he was a convicted felon and unable to be around firearms. Initially, she claimed defendant had never observed her with the weapon and had never been present. However, when asked specifically, she acknowledged that defendant had been present in October 2018 when police recovered the Glock firearm from the locked glove compartment of the Charger.

¶ 35    During closing arguments, the State explicitly named defendant's predicate felony convictions for armed habitual criminal and indicated that based on those convictions, he could not possess a firearm, even if the firearm was owned by his wife. The State described how

19

defendant had exited the Charger and began approaching Officer Gott's squad car upon first being stopped by police, questioning why defendant would not want an officer approaching the Charger. The State recounted Officer Gott's testimony of the vehicle pursuit and stated, "Why run? If you're not doing anything illegal other than a minor traffic violations, why run?"

¶ 36    Defense counsel immediately requested a side bar and objected, stating, "There was other stuff in the car and they're accusing him of having no other reason to run." The trial court pointed out that defense counsel had been the one to move to bar that same evidence and allowed the State to continue with its closing.

¶ 37    The State continued in the same vein, stating:

> "Why run? You run because he knows he's in possession of his girlfriend's Glock, the Glock that's been admitted into evidence. You run because you know you're a convicted felon and you cannot possess that weapon. And not only did he run, but then after striking the squad car and then backing into Officer Gott's squad car he runs. He gets out of the car and tries to escape until he's caught."

The State argued that Mrs. Hamilton's testimony was not credible, that defendant knew the firearm was in the Charger, and that it was his responsibility to not be around weapons. The State concluded its argument by explaining what it needed to prove, once more naming defendant's prior felony convictions as part of that explanation.

¶ 38    Defense counsel argued that defendant was unaware of the Glock firearm in the Charger on February 27, 2019. He indicated it had been under the driver's seat, as Caitlyn Hamilton had testified, then had been dislodged and slid forward on the floorboard during the crash with Officer Leverett's squad truck. Defense counsel asserted there was no evidence that defendant had known about or ever touched the firearm, as no fingerprint or DNA analysis had been done.

¶ 39    In a brief rebuttal, the State again argued defendant knew the firearm was present in the Charger. Furthermore, the State contended, "there is no other reason to flee that officer, to take the steps he took to get away from the police, other than he knew that weapon was in the vehicle and he wasn't supposed to have it."

¶ 40    The jury was instructed on the law and retired to deliberate. During deliberations, the jury submitted two notes stating: "What other things of police interest was found in the vehicle?" and "We feel that we have a juror who is in fear of repercussions ([T.J.]) if a verdict is reached. May we request that the alternate juror is called back to service?"

¶ 41    In response to the initial note, following consultation with defendant, defense counsel proposed that the jury should be informed of the cannabis found, arguing that the State had misstated the evidence by asserting that the firearm was the sole reason for defendant's flight. The State expressed the view that the proper response was to inform the jury they had heard all the evidence. The trial court declined to disclose information regarding the cannabis and instead returned a note telling the jury they had heard all the evidence applicable to the case.

¶ 42    In response to the second note, defense counsel indicated a desire to inquire of T.J. again, seeking to understand what she might have communicated to prompt the note. However, as he articulated his concerns regarding T.J. having expressed fear rather than the mere discomfort of earlier in the day, he broke off his statement and said, "my client says in hearing it all and knowing of her is keep her." The trial court clarified that defendant did not want T.J. excused and that defense counsel was adopting the same position, which defense counsel affirmed. The State indicated it also did not desire for T.J. to be excused and did not believe there was a basis to do so. The trial court responded to the second note by simply telling the jury to continue deliberating.

¶ 43    The jury subsequently returned a verdict of guilty to all counts. The trial court, upon agreement from defense counsel, polled the jury, and all members agreed that the three guilty verdicts were indeed their verdicts. The jury was excused, and defendant's bond was revoked pending sentencing on February 18, 2020.

¶ 44    On February 13, 2020, private counsel, Christian Baril, entered his appearance on behalf of defendant and requested the February 18, 2020, date be continued due to his inability to attend. On February 26, 2020, Mr. Baril filed a motion for a new trial. The case was continued on several occasions and was ultimately scheduled for May 27, 2020, for sentencing and a hearing regarding defendant's pending motion for a new trial.

¶ 45    On May 18, 2020, Mr. Baril filed an amended motion for a new trial accompanied by a memorandum of law in support. The State filed a response to that motion on May 27, 2020. Due to issues related to the then-ongoing COVID-19 pandemic, the matter was again continued to August 4, 2020, for further hearing.

¶ 46    On July 27, 2020, Mr. Baril filed a motion requesting leave to speak with the jurors involved in the case. Subsequently, on July 29, 2020, he filed a second amended motion for a new trial with a supporting memorandum. The second amended motion argued that the State had made improper remarks in closing statements by suggesting that the sole reason for defendant's flight from the traffic stop was the presence of a firearm. Furthermore, it asserted that defendant was denied the right to self-representation and was deprived of a fair and impartial jury when T.J. remained on the panel following the jury note. Finally, it included multiple allegations of ineffective assistance of counsel, none of which involved a claim of ineffectiveness for stipulating to the names of defendant's predicate felonies. Additionally, none of the earlier motions for a new trial raised the stipulation as a procedural error.

¶ 47    On August 4, 2020, the motion requesting leave to speak with the jurors in the case was heard by the trial court, which stated that it did not believe Mr. Baril needed permission to communicate with the jurors and did not intend to prevent it. However, the trial court indicated it did not believe it had the authority to compel the jurors to speak to Mr. Baril. Consequently, based on the trial court's ruling, Mr. Baril asked for a continuance to speak with the jurors prior to a hearing on the motion for a new trial, which the trial court granted.

¶ 48    The matter ultimately proceeded to hearing on February 9, 2021. Mr. Baril had issued subpoenas for three of the jurors, including T.J., to appear concerning the allegations of error involving T.J. Prior to the hearing date, on February 5, 2021, the State filed a motion to quash those subpoenas, arguing that they should be quashed as the matters or statements for which Mr. Baril had subpoenaed them occurred during the jury's deliberations and therefore did not concern outside influence or extraneous prejudicial information. As such, the State argued these were not proper subjects for jury testimony under Illinois Rule of Evidence 606(b) (eff. Jan. 1, 2011).

¶ 49    The State's motion was addressed first. The State reiterated the arguments from its motion, including the absence of affidavits from the subpoenaed jurors or any statements within such affidavits indicating outside influence. In response, defendant argued that, despite the lack of affidavits—since jurors cannot be compelled to produce them—he had spoken to the jurors. He proffered that they would testify that T.J. had told the jury she was afraid of defendant and his family, as she perceived they were dangerous, and so she feared retaliation in the event of an unfavorable verdict for defendant. Mr. Baril argued that, as no evidence of defendant's family being dangerous had been introduced at trial, this constituted extraneous information that jurors could testify about. Furthermore, Mr. Baril assured the trial court that none of his questions for the jurors would be about their deliberative process. The trial court quashed the subpoenas, ruling that

23

Rule 606(b) barred the type of evidence defendant was seeking to introduce, as that evidence pertained to the mental processes and events within the jury room involved in reaching the verdict.

¶ 50    A hearing on defendant's motion for a new trial was subsequently conducted. In support of his motion, defendant testified that there were witnesses with potentially favorable testimony whose names he had provided to trial counsel. He stated that trial counsel had neither interviewed his witnesses prior to trial nor called them to testify. Defendant testified that he had first asked trial counsel to withdraw from his case prior to the entry of the special prosecutor and after an argument. He testified that he had not thought his case would go to trial on January 27, 2020, as just prior to going into court on either December 19, 2019, or January 10, 2020—defendant did not specify the exact date—trial counsel informed him he was not ready for trial and "had some additional discovery." According to defendant, trial counsel unexpectedly announced in open court that he was ready for trial. When confronted about this inconsistency afterward, trial counsel stated that he would inform the trial court that he was not actually prepared. Defendant testified that he responded to this by once again requesting trial counsel to withdraw from his case.

¶ 51    Defendant further indicated that when he spoke to trial counsel about filing a withdrawal, trial counsel indicated he had done so but also indicated he was unable to secure a court date to hear the motion. Defendant testified that trial counsel also told him that the trial court would let trial counsel withdraw on the trial date, allow defendant to proceed *pro se*, and subsequently allow defendant further time to prepare for trial. Defendant testified that after speaking with trial counsel, he filed an entry of appearance with the intention of self-representation but was unable to obtain a court date before trial. Defendant testified that the reason he could not get a court date was that everyone he spoke to indicated they could not speak to him because he was still represented by counsel. Defendant further testified that he had never been shown the discovery in his case and

24

had been requesting that trial counsel have the firearm tested for DNA and fingerprints for nearly a year before trial.

¶ 52     The trial court did not rule on the motion that day; instead, it took the matter under advisement and granted Mr. Baril time to file another amended motion, as during the hearing Mr. Baril indicated there was an additional claim of error his client wished him to make. The matter was then reset for hearing on March 23, 2021.

¶ 53     On February 19, 2021, Mr. Baril filed a motion to withdraw as defendant's counsel, indicating it was per defendant's request. The motion to withdraw was scheduled for hearing on March 23, 2021. Without objection from defendant, the motion was granted by the trial court. The matter was continued to April 6, 2021, for appearance of counsel.

¶ 54     On June 7, 2021, attorney Cheryl Whitley entered her appearance for defendant. However, on July 20, 2021, Ms. Whitley filed a motion to withdraw, citing an ethical obligation not to continue in her representation. On July 20, 2021, Ms. Whitley's motion to withdraw was heard and granted by the trial court. The matter was reset to August 17, 2021, for further hearing to allow defendant to figure out if he could afford to hire another attorney or needed one appointed.

¶ 55     On August 31, 2021, defendant requested the appointment of counsel, which was granted by the trial court. Newly appointed counsel appeared on September 14, 2021, and requested a continuance to further discuss with defendant about his posttrial claims of error. Appointed counsel asked to continue the matter thrice more to facilitate the collection of necessary transcripts and file another motion on defendant's behalf, which the trial court permitted.

¶ 56     Appointed counsel filed a motion to withdraw on December 13, 2021. On December 21, 2021, appointed counsel was allowed to withdraw, and Patrick Hunn appeared *instanter* as defendant's newly hired attorney. Mr. Hunn asked for time to file a new motion for new trial on

behalf of defendant. The State objected, indicating it was ready for a new hearing and that the matter had been pending for some time. The motion was granted over the State's objection.

¶ 57    On April 20, 2022, Mr. Hunn filed a third amended motion for a new trial, the fourth such motion filed on defendant's behalf. This motion reiterated the same allegations of errors as the prior motions. It asserted several new claims, as well, including a violation of the "one act, one crime" rule for the charges of armed habitual criminal and unlawful possession of a firearm by a felon as to the firearm, and the inability of the two predicate offenses alleged for the offense of armed habitual criminal to sustain that offense. This latter claim asserted that both predicate offenses were part of the same course of conduct, and therefore not two separate offenses required for the offense of armed habitual criminal. As with the previous motions for a new trial, this third amended motion nowhere alleged any error regarding the stipulation naming the predicate offenses for the armed habitual criminal charge.

¶ 58    On April 26, 2022, the State filed a response to this third amended motion. A hearing concerning the third amended motion for a new trial took place on the same date. Defendant provided testimony once again, asserting that during the pendency of his case, trial counsel refused to discuss the case with him. Defendant stated that as a result, he had never reviewed the discovery materials, nor discussed them with his attorney.

¶ 59    Defendant also elaborated on the argument he had spoken of during the initial hearing on February 9, 2021, stating that prior to the Saline County State's Attorney's Office request for a special prosecutor, he had inquired of one of the prosecutors with the office as to whether she would agree to his motion to remove the GPS ankle monitor. Defendant stated that during this interaction with the prosecutor, trial counsel had begun "yelling and cussing" at him, prompting

both to be ejected from the courtroom. Defendant indicated that, following that argument, trial counsel had apologized and defendant had no longer felt the need for trial counsel to withdraw.

¶ 60 Defendant clarified that on December 19, 2019, the date of the hearing to modify bond and when his case was initially scheduled for trial, trial counsel had told him, just prior to the trial court judge taking the bench, that he had not reviewed the case, had just received additional discovery from the State, and therefore was unprepared for trial. Defendant explained that as the trial court was setting the trial date, he questioned his attorney about the contradiction between the attorney's statement of readiness and the recent admission of unpreparedness. Trial counsel reportedly whispered back that he would "get it pushed off." Defendant stated that it was after December 19, 2019, that he had "fired" trial counsel and instructed him to withdraw.

¶ 61 Defendant reiterated his efforts to rid himself of trial counsel prior to the trial date and testified that he spoke to trial counsel over the phone the night before trial, suggesting that they should prepare for trial as he had not secured a hearing date for trial counsel to withdraw. Defendant stated that trial counsel was reluctant to prepare, indicating that the trial court would need to allow defendant time to review the case. Based on that conversation, defendant believed that the trial would not proceed the following day. Defendant expressed concern regarding his prior convictions being listed by name as part of the stipulation to predicate felonies for the armed habitual criminal charge. He indicated that, based on his conversations with trial counsel, he had believed the convictions would not be named unless he testified. Mr. Hunn did not pursue defendant's complaints regarding the stipulation as part of his argument to the trial court in favor of the third amended motion for a new trial.

¶ 62 The State largely relied on its prior arguments presented in February 2021 and its written response in opposition to defendant's third amended motion. However, via its written response,

the State acknowledged that the "one act, one crime" rule applied to the convictions for armed habitual criminal and unlawful possession of a weapon by a felon concerning the firearm. The State indicated that these two convictions should merge, with the conviction for unlawful possession of a weapon by a felon for the firearm being vacated and defendant being sentenced on the more serious offense of armed habitual criminal.

¶ 63    The trial court took the matter under advisement. On May 10, 2022, the trial court issued its ruling in a docket entry, vacating the conviction for unlawful possession of a weapon by a felon for the firearm pursuant to the "one act, one crime rule" but otherwise denying defendant's motion for a new trial. On June 28, 2022, defendant was sentenced to 12 years, to be served at 85%, for armed habitual criminal and a concurrent 7 years, to be served at 50%, for possession of a weapon by a felon based on the firearm ammunition. Defendant timely filed a notice of appeal.

¶ 64                                        II. ANALYSIS

¶ 65    Defendant raises four claims of error on appeal. We address those issues in the order they appear within the record. First, defendant alleges that his right to self-representation was denied by the trial court's failure to allow him to proceed *pro se*. Second, defendant argues he received ineffective assistance of counsel due to trial counsel stipulating to the names of the predicate felony convictions for armed habitual criminal, rather than simply stipulating to prior qualifying offenses. Third, defendant contends that the State made improper and misleading remarks during its closing statement when it argued that defendant ran from police due to the firearm in the vehicle. Finally, defendant alleges that the trial court abused its discretion when it barred the testimony of jurors by quashing those jurors' subpoenas. Based on these alleged errors, defendant requests we reverse his convictions and sentences, and remand for a new trial. We decline to do so and affirm, for the reasons explained below.

28

¶ 66                    A. Denial of Defendant's Right to Self-Representation

¶ 67    Defendant claims that he was denied his right to self-representation. Defendant argues that the trial court abused its discretion where he clearly and unmistakably expressed a desire to represent himself several times but the trial court failed to rule on this desire, thus denying defendant his right to proceed *pro se* pursuant to the sixth amendment. Defendant argues that rather than ruling on defendant's unambiguously expressed request, the trial court simply proceeded to move forward as though the matter had been resolved when it still lingered.

¶ 68    The State argues that defendant asked for a trial continuance, rather than making clear and unambiguous demands to represent himself. The State asserts that what defendant's statements truly indicated was that he was dissatisfied with trial counsel and wanted a different attorney, rather than wishing to proceed *pro se*. It further contends that, in not allowing defendant to proceed *pro se*, the trial court correctly made a reasonable presumption against waiver of the right to counsel. For these reasons, the State asserts that the trial court did not abuse its discretion.

¶ 69    Defendants in criminal cases have a constitutional right to represent themselves. *People v. Baez*, 241 Ill. 2d 44, 115 (2011) (citing *Faretta v. California*, 422 U.S. 806, 835 (1975)). They also have the right to hire counsel of their choice, but not to choose their appointed counsel. *People v. Ortega*, 209 Ill. 2d 354, 358 (2004); *People v. Lewis*, 88 Ill. 2d 129, 160 (1981). In order to exercise the right of self-representation, a defendant must "knowingly and intelligently relinquish his right to counsel." *Baez*, 241 Ill. 2d at 115-16. The relinquishment, or waiver, must be "clear and unequivocal, not ambiguous." *Id.* at 116. In determining whether defendant has made a clear and unequivocal demand to represent himself, trial courts "must 'indulge in every reasonable presumption against waiver' of the right to counsel." *Id.* (quoting *Brewer v. Williams*, 430 U.S. 387, 404 (1977)). This determination depends on the "particular facts and circumstances of that

case, including the background, experience, and conduct of the accused." *Id.* The purpose of requiring a clear and unequivocal waiver, rather than an ambiguous one, is to " '(1) prevent the defendant from appealing the denial of his right to self-representation or the denial of his right to counsel, and (2) prevent the defendant from manipulating or abusing the system by going back and forth between his request for counsel and his wish to proceed *pro se*.' " *Id.* (quoting *People v. Mayo*, 198 Ill. 2d 530, 538 (2002)). Put simply, a defendant may not use his right to self-representation to "frustrate the effective prosecution of his case." *People v. Leeper*, 317 Ill. App. 3d 475, 481 (2000) (citing *People v. Burton*, 184 Ill. 2d 1, 24 (1998), and *People v. Hanson*, 120 Ill. App. 3d 84, 88 (1983)). Further, the timing of the request matters: a request may be untimely if made just prior to trial, after trial begins, or even after "meaningful proceedings" have begun. *Id.* While a trial court may consider the decision to proceed *pro se* unwise, this cannot be a basis for denying a defendant his right to self-representation. *Baez*, 241 Ill. 2d at 116. A court's determinations regarding allowing a defendant to proceed *pro se* are reviewed for an abuse of discretion. *Id.*; *People v. Burton*, 184 Ill. 2d 1, 25 (1998). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32.

¶ 70　　Here, the trial court did not abuse its discretion when it did not allow defendant to waive his right to counsel and proceed *pro se* on the day of trial. While defendant certainly stated multiple times that he wished to represent himself, his actual wishes in that regard were neither clear nor unequivocal. The trial court addressed the matter of defendant waiving his right to an attorney and proceeding *pro se* no less than four times. As the trial court noted, over the course of those conversations defendant said many different things about whether he wanted to represent himself. He stated he wanted an attorney, but not trial counsel. Defendant stated he wanted to represent

30

himself but did not have discovery nor proper time to prepare for trial. More than once he refused to answer the trial court when asked directly if he wanted to represent himself. The exchanges between defendant and the trial court are quite nearly textbook examples of exactly the kind of manipulation or abuse of the court process that jurisprudence on the subject of a defendant's right to self-representation seeks to avoid. Based on the record before us, we are categorically unable to find an abuse of discretion by the trial court as to defendant's attempts to proceed *pro se* where his attempts are akin to dissatisfaction with court-appointed counsel, and not an unequivocal invocation of his right to proceed *pro se*. As such, it cannot be said that the trial court's decision not to allow defendant to proceed *pro se* was so "arbitrary, fanciful or unreasonable" that no reasonable person "would take the view adopted by the court."

¶ 71                              B. Ineffective Assistance of Counsel

¶ 72    Defendant further argues that trial counsel was ineffective for stipulating to predicate felony convictions for the offense of armed habitual criminal that included the names of those predicate felonies. In making this argument, defendant relies primarily on our decision in *People v. Taylor*, 2022 IL App (5th) 180192, asserting that the circumstances here and in *Taylor* are similar enough to reach the same conclusion.

¶ 73    In *Taylor*, we reversed defendant's conviction for the offense of armed habitual criminal based on ineffective assistance of counsel, where his attorney failed to stipulate in any way to defendant's predicate convictions for the armed habitual criminal charge. *Id.* ¶ 44. That failure to stipulate prejudiced defendant, as it allowed the State to admit certified copies of those predicate convictions which listed the names of those predicate offenses, unlawful delivery of a controlled substance and aggravated battery resulting in great bodily harm. *Id.* ¶ 46. As a result, the jury learned the names of those predicate felony convictions when they might otherwise not have. *Id.*

31

In *Taylor* we noted, and suggested as best practice, that rather than stipulating to the named predicate offenses for the charge of armed habitual criminal, parties could stipulate instead that defendant had been "convicted of two qualifying felonies under the armed habitual criminal statute" without further elaboration. *Id.* ¶ 48.

¶ 74 The State responds that defendant has forfeited this claim on appeal, as despite having been represented by four separate posttrial attorneys, this claim was never raised in any of his posttrial motions. The State further argues that defense counsel was not ineffective, as at the time this case was tried, *Taylor* had not yet been decided and would not be for nearly two years thereafter. The State contends that *Taylor* was the first case to apply previous standards regarding stipulating to a defendant's felon status to armed habitual criminal charges specifically and that trial counsel in this matter must be judged not against the standard set in *Taylor* but rather against the professional norms in place at the time of trial.

¶ 75 In his reply brief, defendant argues he did not forfeit this claim of ineffective assistance of counsel as defendant brought the matter to the trial court's attention both during trial and in his testimony posttrial. In the alternative, defendant argues that he is entitled to plain error review. We address first the State's contention of forfeiture, and find that defendant has forfeited this issue on appeal.

¶ 76 The Illinois Supreme Court has long held that, "for a criminal defendant to preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion." *People v. Jackson*, 2022 IL 127256, ¶ 15. "Failure to do so forfeits any review of the error." *Id.* "[A] criminal defendant who fails to object to an error and raise the error in a posttrial motion has forfeited the error, precluding review of the error on appeal." *Id.* Claims of ineffective assistance of counsel are generally not forfeited when the defendant is represented by the same

32

counsel that represented him at trial, but where a defendant is represented by new counsel in posttrial proceedings, claims of ineffective assistance of counsel must be raised or forfeited. *People v. Fretch*, 2017 IL App (2d) 151107, ¶ 136; *People v. Ramos*, 339 Ill. App. 3d 891, 899-900 (2003).

¶ 77     Here, defendant was represented by four separate attorneys posttrial. Two of them filed motions for a new trial, with defendant benefitting from a total of four such motions being placed on file prior to the trial court issuing its ruling. None of defendant's motions raised the error defendant now claims. It is therefore forfeited.

¶ 78     Having forfeited this claim of error, defendant asks that we examine the matter under the plain error rule. Illinois Supreme Court Rule 615(a) (eff. Jan. 1, 1967) sets out the plain error rule as follows: "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." The plain error rule allows for review when one of two prongs are met: "(1) where the evidence in a case is so closely balanced that the jury's guilty verdict may have resulted from a clear or obvious error and not the evidence or (2) when a clear or obvious error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." *Jackson*, 2022 IL 127256, ¶ 18. "Under both prongs, the defendant has the burden of persuading the court to excuse his forfeiture." *Id.* However, there can be no plain error where there is no error. *People v. Glasper*, 234 Ill. 2d 173, 203-04 (2009). This is such a case, as trial counsel was not ineffective.

¶ 79     Ineffective assistance of counsel is reviewed under the *Strickland* standard: to establish a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient and (2) that this deficient performance prejudiced the defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). A defendant must show both deficient performance and prejudice in order to prevail on a claim of ineffective assistance of counsel. *Id.* A failure to establish

33

either deficient performance or prejudice will thus be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000). In judging counsel's performance and determining whether such performance was deficient, we must look at whether counsel's performance "fell below an objective standard of reasonableness" based on "prevailing professional norms." *Strickland*, 466 U.S. at 687-88. In finding deficiency, there is a "strong" presumption that the challenged action or inaction was the product of sound trial strategy rather than incompetence. *Id.* at 689.

¶ 80    Here, we dispose of this matter based solely on the first prong of the *Strickland* analysis: trial counsel was not ineffective for failing to follow guidance on best practices not announced by this court until two years *after* this case was tried. Nor do the factors that caused us to reverse in *Taylor* apply to this case.

¶ 81    Here, trial counsel did stipulate, rather than failing to stipulate entirely as counsel in *Taylor* did. *Taylor*, 2022 IL App (5th) 180192, ¶ 40. This difference is material. Counsel in *Taylor* was found to be ineffective due to his deficient performance when he failed to stipulate. *Id.* ¶ 44. Moreover, this case is further distinguished from *Taylor* as trial counsel demonstrated great concern in making sure that any prejudice arising from his client's prior offenses was mitigated, inquiring of every juror about whether they would hold his status as a felon against him, or whether they were capable of deciding the case solely on its facts. This path of inquiry proved quite fruitful, resulting in several potential jurors being stricken for cause when they said they could not promise not to hold defendant's status as a felon against him.

¶ 82    Further, it is worth noting that none of the four posttrial attorneys asserted trial counsel was ineffective when he stipulated to the named predicate offenses for the charge of armed habitual criminal. It is clear that the "prevailing professional norms" in place at the time and place of this trial were such that naming the predicate offenses was not ineffective. As such, the "prevailing

34

professional norms" in place during this trial were to stipulate to the naming of the predicate offenses to prove the offense of armed habitual criminal. This court has announced a preferable way to handle the problem that the charge of armed habitual criminal requires proof of specific predicate offenses rather than simple felon status, one which we expect defense attorneys to adhere to going forward. However, we decline to find deficient performance on the part of a trial attorney who failed to follow our best practice admonishment in *Taylor*, when the trial at issue concluded two years before we issued our decision in *Taylor*. As such, trial counsel's performance was not deficient and his representation therefore was not ineffective. As a result, there is no error and thus no plain error.

¶ 83      C. Improper Remarks by the State During Closing Argument and Rebuttal

¶ 84      Defendant's third claim of error is that the State made improper remarks during its closing argument and rebuttal when it argued that the reason defendant fled the traffic stop was the firearm in the vehicle. Defendant alleges that the State made the "implicit accusation" in its closing argument that the only reason defendant ran was the firearm, while in its rebuttal it made the "implicit accusation" an explicit one when it argued "there is no other reason to flee that officer, to take the steps he took to get away from the police, other than he knew that weapon was in the vehicle and he wasn't supposed to have it." Defendant claims these remarks were improper and even untruthful as 1,362 grams of cannabis were also found in the vehicle he was driving and could equally have caused defendant to flee the stop.

¶ 85      The State contends that its closing argument and rebuttal remarks were not improper. It argues that flight may be evidence of consciousness of guilt, even when there are multiple potential crimes from which a defendant might be fleeing apprehension.

¶ 86     Whether a prosecutor's comments in closing argument require reversal involves a two-part inquiry. In the first step, the reviewing court considers closing arguments in their entirety to determine whether the complained-of comments were improper. *People v. Perry*, 224 Ill. 2d 312, 347 (2007); *People v. Wheeler*, 226 Ill. 2d 92, 122-23 (2007). If the prosecutor's comments are deemed improper under the first step, the "reviewing court will find reversible error only if the defendant demonstrates that the improper remarks were so prejudicial that real justice was denied or that the verdict resulted from the error." *Perry*, 224 Ill. 2d at 347. In determining if improper remarks require reversal, courts should look to whether they are substantial and constituted a material factor in a defendant's conviction. *Wheeler*, 226 Ill. 2d at 123 (citing *People v. Linscott*, 142 Ill. 2d 22, 28 (1991)).

¶ 87     It is well settled that "[p]rosecutors are afforded wide latitude in closing argument." *Id.* (citing *People v. Caffey*, 205 Ill. 2d 52, 131 (2001)). Closing arguments should be considered in their entirety, with the challenged remarks being viewed in the context of the rest of the argument, to determine whether the complained-of comments were improper. *Perry*, 224 Ill. 2d at 347; *Wheeler*, 226 Ill. 2d at 122-23. A prosecutor "may comment on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant." *People v. Jackson*, 2020 IL 124112, ¶ 82. They may not, however, misstate the law or the evidence, express personal opinion, present arguments that are intended to inflame the passions of the jury, or improperly shift the burden of proof to the defendant to prove that he is not guilty of the charged offense. *People v. Johnson*, 218 Ill. 2d 125 (2005).

¶ 88     Here, the State was barred from mentioning evidence of the cannabis by defendant's own motion *in limine* filed on the second morning of trial, after the State's opening statements had alluded to the existence of the cannabis in the vehicle. Defendant concedes that the State did not

36

violate the trial court's *in limine* order regarding the cannabis, as the State made no specific references to the recovered cannabis after the entry of that order. Rather, defendant seeks to foreclose the State from advancing a legally permitted argument allowing the jury to infer defendant's consciousness of guilt pertaining to the pending charge based on his decision to flee the traffic stop because defendant's other illegal conduct may have prompted that decision— specifically, the large amount of cannabis defendant was transporting that defendant did not want the jury to hear about. To allow defendant to succeed in this argument is akin to allowing defendant to use the *in limine* order he advocated for as a shield to prevent the State from making a legally permissible consciousness of guilt argument pertaining to defendant's decision to flee the scene. We decline to do so.

¶ 89    Evidence of flight, defined by Illinois courts as "the evading of the course of justice by voluntarily withdrawing oneself in order to avoid arrest or detention, or the institution or continuance of criminal proceedings," has long been admissible as circumstantial evidence of guilt, otherwise known as evidence of consciousness of guilt. *People v. Griffin*, 23 Ill. App. 3d 461, 463 (1974). Such evidence may still be introduced to show consciousness of guilt even where there are other potential offenses from which a defendant may be fleeing. See *People v. Harris*, 52 Ill. 2d 558, 561 (1972); *People v. Wilson*, 87 Ill. App. 3d 693, 698-99 (1980); *People v. Sheridan*, 51 Ill. App. 3d 963, 967 (1977); *People v. Pelate*, 49 Ill. App. 3d 11, 18-19 (1977).

¶ 90    The State's closing arguments challenged on appeal fall exactly along the lines outlined here as evidence of consciousness of guilt through the medium of evidence of flight. In his argument, defendant relies heavily on *People v. Emerson*, 97 Ill. 2d 487 (1983), but this reliance is misplaced. In *Emerson*, defendant obtained an order barring the admission of evidence of other crimes, specifically a loaded revolver. *Id.* at 496. The State responded to that order by churlishly

37

referencing the fact that there was evidence it could not argue to the jury, remarks that the court found were "clearly improper." *Id.* at 496-97. While it is true that this case and *Emerson* are comparable in that in both cases the trial court issued orders barring the admission of certain evidence unfavorable to the defendants in those cases, it is there that the similarities end. By contrast to the State in *Emerson*, the State in this case did exactly as this court expects, complying with a trial court's order without complaint or appeal to the jury.

¶ 91    A much more apt comparison to this case is that of *Wilson*, 87 Ill. App. 3d 693. In *Wilson*, that defendant was being tried for a charge of rape that had occurred 16 days prior to an incident of domestic violence. *Id.* at 696-97. Defendant had been apprehended for both the rape and charges related to the domestic violence incident on the same date as the domestic violence, and subsequently fled police custody when he was taken to a hospital for x-rays. *Id.* The State elicited testimony from an officer about defendant's escape to support its argument that defendant's flight exhibited defendant's consciousness of guilt, but the trial court sustained defendant's objection to the introduction of this evidence. *Id.* at 697. In sustaining this objection, the trial court in *Wilson* reasoned that the probative value of the evidence was outweighed by its prejudicial effect as either of the two incidents could have caused the defendant to flee. *Id.* Nonetheless, on appeal defendant argued he had been denied a fair trial where the prosecution had presented a "theme of flight and escape" during trial, and the State presented this theme during opening statements without producing evidence to support the theme. *Id.* at 697-98.

¶ 92    On appeal, the First District ruled that the trial court erred when it barred evidence of flight, as the existence of another offense from which defendant could have been fleeing did not render evidence of flight irrelevant. *Id.* at 698. The appellate court reasoned that defendant could not

38

prevent the State from introducing evidence of his flight, then complain that he was prejudiced by the State's failure to introduce said evidence. *Id.*

¶ 93    The parallels of *Wilson* to this case are obvious. Just as with *Wilson*, the fact that defendant could have been fleeing police due to either of two criminal offenses does not foreclose the State from arguing that flight as consciousness of guilt. Further, a defendant, having asked for that same evidence of flight to be barred, cannot then complain on appeal of its absence.

¶ 94    Finally, the State's argument that "there is *no other reason* to flee that officer" (emphasis added) is arguably a misstatement of the facts considering the presence of cannabis found in the vehicle defendant was driving, but in looking at this single phrase within the context of the entirety of closing arguments, rebuttal, and the *in limine* order, we find no error.

¶ 95    As explained above, we find that the State's arguments in closing and rebuttal were not improper. As such, the making of those remarks do not warrant reversal.

¶ 96                              D. Posttrial Testimony of Jurors

¶ 97    Finally, defendant claims that the trial court abused its discretion when, during the hearing of his posttrial motions, it quashed his subpoenas for jurors and disallowed their testimony. Defendant asserts that the juror note received during trial stating that, "We feel that we have a juror who is in fear of repercussions, [T.J.], if a verdict is reached," suggests that the jury was exposed to impermissible extraneous information which he should have been allowed to investigate through juror testimony obtained via subpoena.

¶ 98    The State responds that the testimony that defendant wished to illicit did not concern impermissible extraneous information but instead concerned matters internal to the jury deliberation process. As internal matters are not proper subjects for juror testimony nor a proper basis on which to challenge a conviction, the State asserts that the trial court acted properly in

39

quashing defendant's subpoenas and effectively barring the jurors' testimony. In making this argument, the State points to posttrial counsel's proffer regarding the testimony he expected the subpoenaed jurors to give as evidence that such testimony would have concerned internal matters of deliberation rather than impermissible extraneous information. The State further argues that defendant's argument is barred under the doctrine of invited error.

¶ 99 Rule 606(b) governs the permissibility of jurors in a case acting as witnesses. In pertinent part, Rule 606(b) provides that

> "a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith. But a juror may testify (1) whether any extraneous prejudicial information was improperly brought to the jury's attention, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form." Ill. R. Evid. 606(b) (eff. Jan. 1, 2011).

Rule 606(b) is a nearly word-for-word adoption of Federal Rule of Evidence 606(b) (eff. Dec. 1, 2006), whose principles and language Illinois courts applied even before the adoption of Rule 606(b) in 2011. See *People v. Hobley*, 182 Ill. 2d 404 (1998); *People v. McDonald*, 168 Ill. 2d 420 (1995), *abrogated on other grounds by People v. Clemons*, 2012 IL 107821; *People v. Towns*, 157 Ill. 2d 90 (1993); *People v. Holmes*, 69 Ill. 2d 507 (1978). A trial court's findings as to whether a jury was influenced by extraneous information are reviewed for abuse of discretion. *People v. Schaff*, 248 Ill. App. 3d 547, 552 (1993) (citing *People v. Malmenato*, 14 Ill. 2d 52, 63 (1958)). "An abuse of discretion occurs where the trial court's decision is arbitrary, fanciful, or

unreasonable to the degree that no reasonable person would agree with it." *McDonald*, 2016 IL 118882, ¶ 32.

¶ 100   Both parties point to *Hobley*, 182 Ill. 2d 404, as the proper case to guide this court's application of Rule 606(b) and whether juror testimony should have been received in this matter. We agree that *Hobley* is highly instructive and so we begin our analysis there.

¶ 101   In *Hobley*, the defendant filed a postconviction petition attacking his convictions for murder and arson which, in part, asserted that jurors in his case had been exposed to extraneous information and outside influences that had prejudiced their deliberations. *Id.* at 410, 456-57. In his postconviction petition and supporting affidavits, the defendant alleged several instances of alleged extraneous outside information and outside influences that he claimed had prejudiced deliberations. *Id.* at 456-67. Most pertinent to our analysis here, the defendant in *Hobley* claimed that jurors had been intimidated by nonjurors and that they had been prejudiced by the actions of the jury foreperson. *Id.* at 456-65. In remanding the matter back to the circuit court for an evidentiary hearing on defendant's postconviction petition, the Illinois Supreme Court ruled that the claim of intimidation of jurors by nonjurors was a claim that should be litigated in that evidentiary hearing while the claim of prejudice by the actions of the jury foreperson should not. *Id.* at 458-65. The difference in outcomes between those two claims turned on whether it showed outside influence or instead went to matters internal to the deliberative process—namely, the motive, method, or process by which the jury reached its verdict. *Id.*

¶ 102   The claim of intimidation of jurors by nonjurors derived from an incident that occurred while some of the sequestered jurors were dining at a hotel restaurant. *Id.* at 458-59. As they ate, several men sitting in the same area learned they were on the *Hobley* jury and made comments to the jurors about the case, including "you know he's guilty," "give him the death penalty," and

41

"hang the motherfucker." *Id.* Jurors were upset and scared as a result of this interaction. *Id.* Our supreme court found that this illustrated communication from third parties and thus outside influence. *Id.* at 459-62.

¶ 103   The claim of prejudice from the actions of the jury foreperson derived from accounts of the jury foreperson, a police officer, showing the other jurors his gun during the first day of jury selection, offering himself as an "expert" in proper police conduct, stating that the defendant was guilty and the verdict would be unanimous, and that he and other jurors had worn down another juror into voting guilty. *Id.* at 463. By contrast to the claim of intimidation of the jurors by nonjurors, here the court found that the defendant was not entitled to an evidentiary hearing on the claim as it concerned the motive, method, or process by which the jury reached its verdict. *Id.* at 463-65. The court reasoned that what the defendant sought to show was not outside influence, but rather how one particular juror influenced the others during deliberations. *Id.* at 463. The foreperson's conduct and statements were him bringing his own " 'knowledge and observation in the affairs of life' " into the jury room, as he was permitted to do. *Id.* at 465 (quoting *People v. Rogers*, 16 Ill. 2d 175, 182 (1959)).

¶ 104   The testimony sought by defendant from the jurors at the hearing on his motion for a new trial was much closer to the testimony sought by the *Hobley* defendant in the matter of the jury foreperson than the intimidation by nonjurors. In this case the juror testimony defendant sought to elicit pertained to the motive, method, or process by which the jury reached its verdict rather than an improper outside influence. Here, there is no evidence of any outside parties making contact with T.J. in an attempt to influence her verdict. Instead, based on the proffer put forth by Mr. Baril during the hearing, the source of T.J.'s fears appear to have come entirely from her knowledge of defendant and his family prior to serving on the jury. This knowledge is the same sort of

42

background knowledge that the foreperson in *Hobley* brought to bear, and which our supreme court found to be part of the method and process of a jury reaching its verdict. As such, defendant was not permitted to delve into this area of inquiry involving the sort of internal matter prohibited by Rule 606(b). We find that the trial court did not abuse its discretion in quashing the juror subpoenas and thus barring their testimony.

¶ 105   Further, as the record establishes, defendant was aware of the fact that T.J. had known him for many years and was personally familiar with him, yet each time a suggestion to remove T.J. from the jury was made, defendant insisted that she be allowed to remain on the jury. We agree with the State that defendant's argument runs contrary to the doctrine of invited error. See, *e.g.*, *People v. Carter*, 208 Ill. 2d 309, 319 (2003) (holding that "[u]nder the doctrine of invited error, an accused may not request to proceed in one manner and then later contend on appeal that the course of action was in error"). Defendant should not be permitted to assert on appeal that T.J.'s familiarity with him prejudiced him in her deliberations, where defendant invited the potential error by requesting that T.J. remain on the jury.

¶ 106                          III. CONCLUSION

¶ 107   For the foregoing reasons, we affirm the judgment of the circuit court of Saline County.


¶ 108   Affirmed.